I'm not sure I feel welcome. I think you are. Again, for the record, Don Shanahan, Deputy City Attorney representing Christopher Walb. The same kind of issues we have here, Your Honor. I won't go over them. It's an officer-involved shooting. It's a case involving a decedent from the shooting. Again, we have a Cruz v. City of Anaheim situation. Our position here is that the court, again, did not properly apply Cruz. The court found four different instances of what the court seemed to indicate were inconsistencies. One, that Lopez did not have a gun in his pocket, so why would he keep his hands in his pocket? His right side was facing Officer Walb at the time he fired his weapon, which may raise doubts as to whether Walb could see his left hand due to his body position. The three officers refused to answer questions concerning the debriefing that occurred the next day after the shooting. And finally, the court indicated the plaintiff presented evidence that when shot, Lopez was compliant with the court's order to get down. First, with respect to the no gun. In Cruz, not only did he have no gun, there was no reason to reach for that gun. In Cruz, I suggest, does not stand for the proposition if there's no gun, automatically there's an inconsistency. What Cruz said was there was no gun and it made no sense for him to reach for a gun. In this case, we have, I'll start with a number of reasons, but three of them that I would present to the court. And the first one, in his pockets were one syringe with dark brown liquid, which was apparently narcotics. Was that in the left pocket? We don't know. I looked for that and I couldn't find it. We know it was in his pocket. And Officer Walb says his hand was in his pocket, but I couldn't figure out if the drugs were in the... Walb didn't do the subsequent examination. In other words, I'm sure the court's aware when there's a shooting, they cuff him. Anyway, we don't know. Right, and Walb didn't do that inspection. The officers that did that inspection, we talked to them, and I don't know if that's in the record, but in any event, they couldn't... You've answered my question. Okay. Mr. Shanahan, let me ask you a factual question. These three officers were essentially special weapons and tactics officers. Correct. And they had all attended the briefing at the precinct before they were dispatched to assist in the arrest? You mean before the incident? Yes.  I'm trying to find out what information they had with regard to... No, they... Can I change my question? I'm sorry. I'm just trying to find out what information the officers knew at the time as to the background of Mr. Lopez, whether or not he might be armed, the information that had been provided by the parole officer. Their sergeant came and informed... He was at the briefing. He came and informed them of the information they had, and while they were at the scene, they were in a van. They were at the scene. They were continuing to get any information. The information that Walb had, he knew he was a parolee at large. He knew there was obviously a warrant for him. He knew the informant said there was a pistol. He would have a pistol, and he would have it in his pocket. He didn't say left pocket, but he did say pocket. He knew that he was at the particular address. He knew that he belonged to either a gang or a cartel. What were these officers wearing? They were wearing the camouflage uniforms as well as vests. Helmets? Helmets. Kevlar on their arms? Yes. Kevlar on their legs? Right. All carrying machine guns? Yes. Never saw a gun? No, they did not. I still want to finish your laundry list here of what they knew. All right. They knew he had, let me see if I can get it out here, that as a gang member, the gang he belonged to was a violent gang. That they used weapons and were willing to use weapons. That he, as I recall, that may be the basic information, that they're staying at Department 58, which also had a sawed-off shotgun and AK-47 in it. They knew that going down the hall? Yes. Not after the fact, they knew it going in? Well, actually, as a fact, there was only the ---- Well, I mean, the fact was that that had been reported to them, is that right? Yes. Okay. They had, that his father was also living there and was a gang member as well. In any event, in his pocket also were three bindles and a medical container with a bindle, which also had what appears to be narcotics, which would give him a reason to have it in his hand and his pocket. Oftentimes, as the court's aware of these people who have these drugs, get rid of them if they can. So Pickett and Scott testified that Lopez was standing when he was shot? Correct. And that's squarely contradicted by the ballistic evidence, correct? That's not what the officer who shot him said. Pardon me? That's not what the officer who was first in line who actually shot him said? The officer first in line. So that's what Pickett and Scott said, right? Well, I'm going to try to answer your question this way, Your Honor. When they shot, he was standing. When he got shot, he wasn't standing. So there were two volleys, and we don't know which one was which. If you're a machine gunner, someone, it stands to reason he's not going to be standing very long. It's all a point of machine gunning. I understand that, Your Honor. What Walp said is that right before the shot, the suspect slightly bent his knees. There were two bursts. The first burst hit the east wall. Do we know that, that that was the first one? Well, that's what our expert says, and it makes sense. Well, I agree it makes sense. So go ahead with what you're saying, but I'm not sure I really know that. So go ahead. Well, again, for the best of the evidence, the first burst missed. And one reason they say that is because the first burst, the shots were along the wall at his highest level. Yes, I know. The other three shots were down low, so it doesn't make any sense that he would have missed with the second round being high. Go ahead. I don't want to engage you on this point, because otherwise you're going to miss your other point. Your Honor, to your point, the fact that if we assume the first three shots missed, the cycle of the bullets go approximately 0.75 per bullet. That would, not counting the first shot, but counting just the second two shots, that would be 0.15 seconds. The expert also said, the ballistic expert also said, that an average person to re-engage, now it might have taken longer after the first burst, to re-engage is 0.25 seconds. So that would be approximately four-tenths of a second. In that time, and again the expert talks about when you hear the shots go off and so forth, you're going to automatically, voluntary or involuntary, you're going to duck or move or do something. And in doing that, you have four-tenths of a second, which gives him, according to the expert, enough time to move his body to get in a position where he was shot. Now, even plaintiff's... That's why you could win. That's why a jury could decide you're right. That's correct. Yes, but a jury wouldn't have to. But there's no evidence. The jury could also decide, right, and this is what's important, I think, to me, if you could help me out. The first person in this line of three officers, the one who pulled the trigger, the defendant here, testified, unlike the other two, that this individual had started to, we don't know voluntarily if he's ducking or one way or the other, but that his body had, certainly his knees bent, right? He started, plaintiffs or the appellees are going to argue that he was going down to his knee. Right, and we can't tell if he was ducking. No, we can't. Or if he was starting to comply with the order that the defendant had been giving him, which was to get down. Right. We don't know that. We don't, and that's the point. The question is whether he was complying or not. So, counsel, if I can get to my question. So is your argument, that's right, is your argument that even if the officer who was first in line was wrong, he wasn't unreasonable in pulling the trigger when he pulled it? Yes. And let me explain if I might. Sure. The question isn't whether or not he was complying. We don't know. The question is whether at the time the officer shot, whether it was reasonable from his perspective, he's not in the position of knowing what's in the mind of the suspect, was it reason for that officer to believe that his life was in imminent danger under Tennessee v. Gardner? Right, and this is why it matters so much to me that one of the officers behind him said that he could see the left hand and he could see it for between five to eight seconds prior to the shooting. So the hand was out, according to that guy, the hand was out of the left pocket for between five to eight seconds. What about that, counsel? That was when they went to the apartment. He went to the apartment, obviously he had to take his hand out. Right, which is immediately before the shooting. Well, but what he did, it would say, he came out of the apartment, then thrust his hand back into the glove. Just to be clear, he was never in the apartment. He came out of a little alcove is what you mean. Right. Because the door's locked, so he turns away. Puts his hand back into his pocket. That is not what the officer behind said. Or if he did, could you give me the record site? I can't give you the record site. What exactly were these three officers who were wearing military-grade body armor afraid of? They were afraid that he was a little perspective. Waub testified that he had a very similar situation some time back where the individual had his hands in his pocket and was digging, tugging. He chased that individual down, tackled him, and lo and behold, he had a weapon in his pocket. Coming back to this scene, what they were afraid of, this fellow was known to have, was supposed to be carrying a pistol. They were convinced he had a pistol. They were convinced that he was a gang member and would fight. He didn't comply from the very beginning of this incident. Down in the parking lot, the two officers pointed guns at him, assault rifles. Not these two officers, two others. They told him to stop and get down. He ran. He didn't comply in the stairwell. He didn't comply when they got upstairs. He didn't comply when they got into the- Comply meaning he didn't stop. Didn't stop. Right. Right? Right. Okay. So when he stopped and they said, all right, he stops, keeps his hands in his pocket. There's a weapon in there, at least these officers believe that it is. He raises his hand, his right hand, but this fellow's been in the system for years. He knows what it means to get your hands up and get down. You get your hands up and you get down. Kept his hand in his pocket. Kept the right hand in close. They thought he was trying to hide something. And instead of getting down, they thought he was making believe he was going to the ground Stopped and turned very slowly. And they thought he was trying to check out and see where they were. Now, does it make sense for that individual to do that? That's what the officers perceived. And we know in the system, the toxology report showed that he had methamphetamine, amphetamine, heparidine, and morphine. And our drug recognition expert stated that with that amount of drugs and those kinds of drugs, it was very likely the person would act irrationally, erratic behavior. Now, the officers didn't know he was under drugs. No, no, but what I'm saying, it's an explanation for his actions. Under Cruz, you want us to take into account the circumstantial evidence. Correct. Okay, so, counsel, if you could get back to, I think it matters that the officer, at least one of the officers behind, thought that he could see the left hand out of the pocket for 5 to 8 seconds. And I don't want to belabor the point, but I've got that here on ER 367. And you're telling me, is this the place in the record that if I keep reading and reading, which I've been trying to do here, that at some point he's going to say he saw the hand go back in? Correct. You think it's in this deposition? I don't know if it's that deposition or his declaration, but he did say that this is Jason Scott. And you think this witness, that's where I'm going to find it? Did not see the hand out immediately before the shooting. Okay. I'm sorry, was it Officer Scott or the third officer who was raising his rifle to fire and said, I would have fired, but for the fact that Officer Walb was in the line of fire? Both of them. Both Scott and Walb? Both and Scott. They were convinced that this individual was going to turn around and shoot. All three of them were. And these individuals, by the way, are highly trained. And I won't go into that. I'm sure you know. It's an elite unit and they get special training for high-risk arrests. Right. The first unit is police and patrol, but they get called in. These guys are 24-7. Why weren't they permitted to be deposed about the group meeting they had the next day where they told their stories to each other? What was the? The psychologists, because they felt that there was a privilege. What privilege? Psychologists. They were talking to the psychologists. It's kind of like any other person talks to a psychologist or treatment. And that's partially what it was for. An individual was killed. So this psychologist was representing all three of these individuals? Well, it wasn't representing. I mean, sorry, was the physician for all three of these individuals? Correct. Is he the department psychologist? Is that who this guy is? I believe so. Okay. The point is, Your Honor, that it's not an inconsistency with respect to the event. I was just trying to understand what the point of these meetings like this is. These are standard meetings? Yes. When somebody, an officer kills another officer, they present them with basically psychological help. And they get together and jointly tell their stories? Sometimes it's joint, sometimes it's not. I didn't mean that pejoratively, jointly tell their stories. I mean give their version of the events in each other's presence. Correct. And quite frankly, if counsel wanted that information, he could have objected and gone to the magistrate and got a ruling right then. But neglected to do that. He's neglected to do that. And quite frankly, if this goes to trial, there will be a motion in limine and the court will decide it one way or the other. So the jury is never going to hear that. So that's not an inconsistency. I think I'm out of time. You are. Thank you very much. Ardell. Mr. Court, I had an opportunity actually via videotape to watch the two arguments yesterday. And of course I've seen the one before. Let me respectfully submit that it is not necessary, at least in this case, for the court to pour through a voluminous factual record with 150 pages of ballistics deposition testimony and 100 pages of contradictory ballistics reports, diagrams, and analyses. The case of Johnson v. Jones is a Supreme Court case. It says that quite properly, under qualified immunity, officials who are being called to answer for behavior that is not clearly prescribed under established law have a right to an interlocutory appeal on the issue of law. The issue of law and whether it's clearly established. With all due respect, from beginning to end in this appeal, we have been debating not the relevant issue of law. That is the only thing on which the two parties in this case have agreed. We have been debating facts. But under Johnson v. Jones, this court does not have jurisdiction to review the factual findings. You're not suggesting, are you, that summary judgment can never be granted on qualified immunity grounds in these types of cases? No, not at all. Not at all. What I am saying is this. In Johnson v. Jones, the issue was whether three policemen did what they were alleged to have done. And there was a dispute. The policemen took the appeal and they said, well, we have a qualified immunity appeal. We didn't do it. We didn't do it. And the Supreme Court said more than two decades ago, when your defense is not the law was not clearly established and therefore there was no norm, no rule, which could have guided our decision, but we didn't do it, then you don't have a right to invoke the appellate process and go before the Court of Appeals. Because the Court of Appeals exists not as a three-person trial jury, not even for the review of the issue of whether summary judgment was properly granted as a factual matter. They exist to determine whether or not the law was clearly established. Now Judge Curiel in this case said exactly the point that was made, which is, you know what, those are all good arguments. A jury might believe that, but they also might believe the ballistics testimony and the evidence presented by plaintiff. Because what? Just summarize it briefly. Yes, I will. The ballistics expert that we had testified that the officer's version could not have happened, that he could not have been turning to his right because the angle of the bullets was such that they were going left to right instead of right to left, which would have been the case had the officers been correct. Second, he could not have been standing. And I'd like to explain this if I could. The officer, Wolb, is standing, he has his knees bent, so he's five feet eight, has a machine gun, an MP5 machine gun, and he's aiming it like this. He says, almost parallel to the ground, the bullets in the body of the decedent, and I hope you will forgive me, but the bullets in the body of the decedent were back to front, but they were within the body. They were from below to the top. So if somebody's standing up and he's shooting like this, it's not going to go from below to the top. As a matter of fact, the two chest wounds, the two wounds, one started 22 inches below the top of the head and comes out the front 16 inches. So it's got an angle like this, an upward angle. Unless that officer were on the floor looking up, shooting directly above him, you can't get that angle. The only way you can get that angle is if the torso is below the level of the machine gun. And our expert said that it was consistent with his being down on his knees with his torso going toward the ground. That would explain, because the bullet in the head goes in the back of the head and blows out the front part of the skull. The bullet that's lower rises 7 inches. And then there's a third bullet that goes in, as I recall, 16 and a half inches below the top of the head and lodges under the scapula. After having traveled, I believe, about 5 inches. The ballistics in and of themselves, if believed, would not only say that these officers are lying, would say they did something very close to an execution. Now, they have their explanation, and apropos of that, their explanation relies on the claim which cannot be scientifically supported that the first three shots missed and thereafter the next three shots hit. Scientifically, there's no way an expert can say what happened. Mr. Urgell, was the testimony here that the officer had placed the selector switch on a three-round burst, or did he pull the trigger six times? No, no. The claim is that there were two bursts and that it was on... You're familiar with the weapon, are you not? I am familiar. Okay, it has a selector switch. You can fire either semi-automatic, one round at a time, a three-round burst, or full automatic. Did the officer testify what setting he had placed the weapon on? My recollection, and I don't want to swear, but my recollection is... Did anybody ask? Yeah, no, no, we did, but the contention was, and we didn't dispute this, the contention was that it was on fully auto, but that there were two taps, tap, tap, and the presumption or the operating assumption was three bullets each tap, so that the testimony was it takes 14 one-hundredths of a second to go like that, a quarter of a second to do it again, and so within about half a second, all those bullets were gone. If you bat your eyelashes four times, that's how long it took. And so the other thing I need to correct is this. Our expert did say that you, from a forensic point of view, you need to look at the evidence of where the bullet strikes were on the wall, the misses. Counsel has misstated in the record, in his brief, throughout the level of those shots, because Wald says, I aimed and I was aiming at center mass. Well, if he was aiming at center mass, center mass for the first missed bullet was three feet five inches from the ground, and for the second missed bullet, which is labeled B on the wall, it was two feet two inches, also consistent with firing a gun at a man who is kneeling on his knees with his torso in a downward motion toward the floor. Now, whether I'm right or he's right is not for this court to determine. The district court judge made a finding, a factual finding, that there were sufficient disputed facts that a reasonable jury could agree with our position. If we're right, and they shot him in the back while he's down on the ground, we win. If they're right, and for whatever crazy reason, drugs, lunacy, self-destruction, or maybe, as in the Cruz case, his pants started to fall down at the most inopportune time, but if he put his hand in his pocket and was truly turning in a manner that made them think they were going to be shot, they're going to win this case. But they have no right to delay this case for two years, to delay the resolution of the case for the widow or the children. This was a case where the rule of law, the qualified immunity issue, was never, ever in dispute between the parties. Tennessee versus Garner, and all the cases after it. And this is exactly like Cruz, and it comes down to that. I'm not sure that's totally right, though. Because a jury on this evidence, if you're correct that these material facts are all in dispute and a jury's going to have to resolve them, a jury could find that based on what the officers knew about Mr. Lopez's background and crediting the officers' story that they thought he was going for a gun in his pocket, then deadly force would have been authorized as a matter of law. And the jury, I assume, will be so instructed. If they were told, if they find as a fact when he was told, stop, get down, that he then fell to his knees and was in a forward motion toward the floor and he never put his hand in his pocket, they could not make such a finding. And if the jury accepted your ballistic testimony, they never could have made such a finding. That's right. They've got their ballistic expert, you have yours. And if they accept his, and if they accept the oral testimony of the officers, which we contend is disputed by the statement of earwitnesses... No, no, no, I understand that. But these are inherently credibility determinations that your argument is only the jury can make. That is correct. But I guess the question I'm really asking you, because it does seem to me from this record, that the jury could go either way, that they could render a verdict in favor of the officers. Depending on what the facts are. But what I'm saying is, and if I could just ask the court to please look at Johnson v. Jones, because it's really not been put into practice, and it should. We have a motion, I don't mean to be churlish to counsel, I've known him for 100 years, but we have a motion for sanctions. And even if the sanctions are only $1 or $10, I ask you to impose them, because this case from the very beginning was an abuse of the court's jurisdiction. This court sits, not to read enormous records and figure out whether this bullet mark was over there or up there. That's what Johnson v. Jones says. It says that the essential competence of the Court of Appeals is based on its institutional knowledge of the law, what is clearly established and what is not. I ask to declare that the city's appeal is frivolous. I do. We understand your request. And the reason I do is because the briefing itself shows, if you'll just look at the briefing, the briefing itself shows never, ever, ever did they say, oh, the question of what rule applies is in doubt, etc. No, the rule was the only thing, the rule of law, the established law, was the only thing we ever agreed on in this case. It's the facts and only the facts were in dispute. And Johnson v. Jones says, this court has no appellate jurisdiction to determine a disputed issue of fact or the sufficiency of evidence for the district court's determination that disputed issues of fact precluded summary judgment. Now, there are two situations in which the review of facts are tantamount to issues of law. One is if the district court relies on a fact that is immaterial, that is itself an issue of law. And second, if the district court in applying a legal standard to the facts applies an erroneous legal standard, then the court can review essentially the factual undergirding. But on the essence of it, on the guts of this case, who's telling the truth, what really happened, Johnson v. Jones says this, if the issue that you want to bring to the Court of Appeals is what happened as opposed to what is the law, what is the rule, what is the norm that applies here, the Court of Appeals has no jurisdiction and your appeal is frivolous. This happens again and again and again. Just by filing a notice of appeal, the officers have the right to delay a case two years. I do not... There's a reason for that. The Supreme Court has told us that qualified immunity is not simply an affirmative defense. It is a doctrine which is to be invoked to protect government employees from having to even stand trial. Or go through discovery. Yes, and Judge Tallman, I fully understand and indeed the Johnson v. Jones Court fully understood the important public policy that's involved in qualified immunity. I do not quarrel at all with the policy of qualified immunity. You do not want public officials to be constantly in dread of lawsuits and to have that inhibit the forthright performance of their duties. But you have to go with the Supreme Court. The Supreme Court in Johnson v. Jones in construing the application of qualified immunity says the officer has every right to go to the court and say this law, this norm, this rule you're applying upon me is not clearly established. I have no basis to know. How do you then explain the Supreme Court's decision in Scott v. Harris where the Supreme Court watches the video of the high-speed chase in order to determine whether the officers are entitled to qualified immunity? I guess I would say that the Supreme Court would respond fully to consistency as the Hobgoblin. They could do it because they're the Supreme Court. I'm just trying to save this court from having to be Well, I don't know that you've saved us any time but I hear what you're saying. I understand your argument. Thank you so much. I don't know if the court wants any argument on the jurisdictional matter. I think we understand the issue. First of all, I just want to respond to the remarks about where they shot Mr. Lopez. Their expert states in his report that body positions consistent with being fully upright and erect and those positions fully prone on the floor can be eliminated as possibilities. Both experts have the suspect going down. In between. Nobody can tell where he was when he got shot. That's number one. And nobody can tell why he was in between. Whether he was collapsing, ducking, or complying. That's my problem. That's true. But again, as I said before, the question is whether he was complying or not. It was unreasonable. One more. I'll give you one more. The counsel talked about the suspect turning and he went like this. That isn't what he did. And I think that's terribly important because their Blissex expert found that if the officer lost sight of the hand, he would have turned about 30 to 45 degrees. There's no basis for that. And that's important. That goes to Scott V. Harris. With no support for that finding. When he turned away from the door from apartment 58? Right at the shooting. I want to back up. He's running down the hall. Door 58 is on the left, right? Correct. He couldn't get in. The door was locked. Didn't he turn back to continue down the hallway? The same way he was going. He stopped. He keeps his hand in his pocket. Starts to bend his knee. His right hand is up near his shoulder. And then he slowly turns over. They thought he was looking to see where they were. To assess the tactical situation. Correct. And the reason that's important and the record doesn't support their expert saying he turned to 45 degrees, during the deposition taken of the officer, Mr. Ardale, and I'd like to read this, it would be very quickly. Now also earlier in the day said that Mr. Lopez, when you shot him, was not exactly with his back to you. You said he had his right side to you. Did I understand that correctly? Yes. What part of his body was presenting to you? At the moment that you shot, was it at his side or his back? Can I show you? Yes, of course. At this point, now we're in a video deposition, and at this point the officer turns like so, as I'm describing. That's before the court. So for the record, he's describing that the victim turned to look over his right shoulder. Correct. And the question was then asked about, he describes how it was, and counsel says so it was his back that was presented to you, and albeit slight angles. Was that fair? Yes. So that's described there. The expert said that when he lost sight of his hand, he would have been turning approximately 45 degrees. He never saw his hand come out of the pocket. So it wasn't because of his body position, it was because of his pocket. I think we have it. Thank you very much. Thank you both. This argument is submitted and will be adjourned until tomorrow morning. Thank you.
judges: Parker, Tallman, Christen